Good morning, Your Honors. May it please the Court. This Court set forth the definitive test for evaluating FCA complaints in Grubbs v. Coniganti. That test has become the leading case for the majority view in a circuit split on how The Grubbs test maintains a delicate balance between three competing considerations. It recognizes that Rule 8 requires notice pleading in a short and plain statement of the claims, that Rule 9b is a flexible and context-specific requirement that requires that particular details of fraud be alleged, and that the FCA is a broad remedial statute whose purpose is to remedy frauds against the public fisc. The complaint here meets the Grubbs standard in spades. The first aspect of the Grubbs standard is that the complaint must plead particular details of the fraudulent scheme, and the complaint does so here. The relator offers an insider perspective as a former sales manager at the defendant, and he supports his allegations with internal communications and e-mails that are contemporaneous from the defendant. These allegations show that the defendant targeted high potential referrers with large government payer patient bases, with large government providers, particularly VA patients with TRICARE. That they provided numerous benefits to these providers, including tens of thousands of dollars in cash, trips to places like Las Vegas, meals at fancy restaurants, free administrative labor, and most egregiously an annuity system whereby they greased the wheels for private payer patients to become customers of Senseonics and set up these patients as annuities for the doctors because the patients would have to keep coming back every three months for another procedure to reinsert a new sensor into their arms. There's a serious question, though, whether you've adequately alleged Scienter in this case. Can you show us where you did? Yes. If you look at paragraph 70 of the complaint, that's probably the most obvious place. In paragraph 70 of the complaint, there is a reference to a program within Senseonics and a presentation that was given to sales associates at Senseonics, and it mentions, and this is a quote from the presentation that was given by Senseonics, we cannot reimburse a health care provider that has the ability to prescribe, influence, or direct a patient to Eversense. This would be considered inducement in a violation of the anti-kickback statute. So Senseonics recognized that the anti-kickback statute prohibits giving remuneration in exchange for inducements, and of course they recognized this because the anti-kickback statute is a fundamental statute within our health care regulatory regime. We're not talking about an obscure regulation. We're talking about something that is a criminal offense to give inducements and something that virtually everyone in this space understands. We also see that when it comes to the various sham programs that Senseonics put in place to get private payer patients as annuities for doctors, which provides a benefit to doctors because those patients become annuities, it limited it to private payer patients. They, ostensibly, they thought this would keep them out of the restrictions of the anti-kickback statute, but the fact that they even drew that distinction at all shows that they were aware of the problems with providing remuneration in exchange for federal referrals. And the rest of the evidence shows that they clearly intended to induce referrals of government payer patients, especially VA patients, through their providing of inducements. I mean, even with a slightly relaxed Grubbs test, do you list or describe any particular kickback where money was given to a doctor? Sure. What's the most particular? Because words like annuity, I mean, I'm sure they'll stand up and say, that's just descriptive. In other words, of course, if a patient needs this type of glucose monitoring device, they got to go back again and again. So calling it annuity is just a sort of syntactical move. They're not locked in just because they have to, they just simply have to go back to the doctor to put the sensor in. Well, these pull through schemes in which private payer patients are put into a pipeline to benefit doctors in exchange for federal referrals are common, but there's other types of remuneration that are provided. For example, paragraph 73 says that one provider, Dr. B, was paid more than $20,700 in 2019, including more than $2,000 in travel and lodging. Yeah, but sending doctors to speaker engagements, whether we like it or not, is not fraudulent. Well, it can be, but if one of the purposes is to induce federal referrals under this court's one-purpose test that's been adopted in circuit courts across the country, it still is illegal. The fact that there may also be a legitimate purpose, and we would dispute whether there is even here, but it's irrelevant to the question, because as long as one purpose of the referrals, of the payment of the remuneration was to induce referrals, then it violates the anti-kickback statute. We also see that other doctors were paid over... Just even reduce it more simply. Specifically, as a salesman, the relator was doing what? He had a device that's approved by the FDA, and he's encouraging patients and doctors to use their device. That's just legitimate. Of course, you're going to promote your product. Yes. So when you say, where does it slip into fraud? It slips into fraud when we see that the... But B, is factually, instead of sham and annuity, tell me exactly where the fraud happens. One good example is, we see that in the internal communications, they are monitoring the requisitions of the doctors who they're paying. We see specific emails in which managers at Senseonics are saying that this particular provider's requisitions are down. We need to get her re-engaged again, or him re-engaged again. But isn't that just what you do? The doctor's just, you know, he must be using somebody else's product. Let's get the salesman in to talk. Find out what's wrong with our product. They didn't just get the salesman in to talk. They took... The way they got him re-engaged is they took them to dinner at fancy steakhouses. In fact, they say in one, Mr. Ramirez, one of Mr. Carew's managers, says that a particular provider's requisitions are down. Let's take her to dinner and get her re-engaged again. When you say requisitions are down, you mean they're just not using the product enough? They're not ordering that the product be used enough. Okay. So you'd be concerned. If you believe in your product, you'd want to go say why. Why aren't you, you know, and I thought the primary basis for the inference of fraud was that the CPT code jumps up for these three doctors. That is one of the primary bases. There are several. Certainly... Tell me what your most specific, the most, the biggest aggravator, indicator of fraud is. I thought that was it. Well, there's many of them. I know you're going to say many, but just to simplify a case for me, tell me the most egregious that isn't aggressive marketing. It's fraud. It's money for something a patient doesn't need. Do you have that? I'd say the most egregious indicator of fraud is that they are especially monitoring the requisitions of these providers, and when they find that the provider's requisitions are down, they provide additional remuneration and benefits in order to get those requisitions back up. That is a textbook example of providing remuneration as, in order to induce referrals. And what's your, what's your best example in the FCA context? That seeing that a doctor's not using your product, going to him and saying, can we talk about it? You, let's go to dinner. You're going to come speak at our conference. What's, what's an example of any case that says that's fraud? Well, there's several. Your best case? I would say, um, some of the cases that are similar. No, just the best one, because everyone knows that's the question I ask. What's your strongest case? Well, I would, I would point you to a few of them. Within this circuit, I would point you to Marlin Medical, which is in the Western District of Texas. I would also point you to Parikh. Okay, that's fine. And then in other circuits, uh, in the Northern District of California has a couple of really good cases, one called Vibrant and one called Crescendo that are very similar. These are in your brief? Yes. Okay, thank you. That's all I need to know. Um, the second aspect of the Grubbs test requires reliable and dischievous claims. And we have, again, abundant allegations of reliable and dischievous claims. Not only do we have the, the messages about monitoring the requisitions, and we also have internal documents, uh, advising that they target patient, uh, doctors with heavy VA patient loads, looking at insulin bill, uh, uh, reports for VA patients, and saying that hundreds of, of patients are, from the VA are already using these products. We also have Medicare claims data. Now, the Medicare claims data are for services that would be associated with a device like Syncyonix device. And we see that after these providers who were targeted were provided with remuneration, their use of these billing codes skyrocketed. This is 92521. There's two different billing codes. But aren't they both generalized? They're not specific to you. That's correct. But at the time, we also have allegations in the complaint that Syncyonix was marketing their product as the world's only long-term CGM product. So the, the allegations are that at the time, this was the only long-term CGM. And so these billing codes, which are available to infer that those are related to this product. Um, it also, uh... Where's the fraud? I'm sorry? Where is the fraud? The... Uh, for the United States government, the government funds. The fraud is in the implied representation that claims that are submitted are not tainted by kickbacks. Mm-hmm. The underlying product itself, uh, does it not do what it's supposed to do? No, but that is not a relevant consideration under the anti-kickback statute. The, it, the question of medical necessity... I want to test your factual question. What in the record shows that there's any failure of the actual product itself? It's an illegitimate product. It doesn't do the job. There isn't any evidence of that or any allegations. This is just a promotion of a product which has a medical benefit. But you said there's, your argument is that the, that the government was cheated because you promoted the product so much that in turn, of course, that came out of the federal treasury. Uh, but what's the fraud in... That's right. I think the policy behind the anti-kickback statute is that remuneration and compensation to medical providers clouds medical judgment and therefore has a corrosive impact on the entire system. And so whether or not a service or product is medically necessary or beneficial to the patient is not the question in a kickback case. The question is whether the defendant intentionally offered inducements, remuneration in order to induce providers to prescribe the device or the service because that corrodes the medical judgment. And as a person who goes to a doctor, I think we'd all like to know if our doctor had received tens of thousands of dollars in trips to Las Vegas and other benefits for the products and services that they were recommending that we use. Most, most top doctors are taken on these extraordinary trips. You're saying all of that is fraud? Well, it's not all fraud, but in this case it is. And the evidence shows that the intent of providing this remuneration was to induce the doctors to make these referrals. And that is exactly what the anti-kickback statute prohibits. There may be other cases in which that evidence doesn't exist. Uh, in other cases in which these, uh, speakers are targeted because of their, uh, you know... A copy of your complaint to the government. What was the reply of the government? The government did its investigation. We had little insight into that. They asked for some extensions and this was filed during the COVID pandemic. So, uh, there were some obstacles to the investigation at the time. Um, ultimately the government declined, but that is part of the statutory design of the False Claims Act that relators are able to move forward with the claims. I would mention that the False Claims Act does contain a nearly unfettered right of the government to dismiss the claims if it finds them to lack merit, uh, or for any other legitimate purpose and the government never did so here. Um, I would, I only have a few more minutes I'd like to reserve some time, but I would like to close by saying that the district court here recognized that the allegations were certainly plausible, troubling, and implicated potential ethical issues. One thing of public knowledge is that the incredible amounts of money, millions of dollars, that are, which the government is directly being defrauded, uh, by, uh, by certain people who are setting up and simply filling out the paperwork and for false people, you know, getting a, getting hold of just a social security number and a name and to typing it in and it's automatically paid by the United States government. And, uh, it's maybe that's where their focus is. You're talking about a product that troubles me about your cases that you're talking about just a promotion of a product, uh, urging people to do a product, which you're not saying is not medically, provide a medical benefit. Well, if it's the medical benefit alone that would sell the product and it's simply information about the product and its benefit to customers, uh, were all that was needed to persuade doctors that use it, then we wouldn't have a case. But unfortunately what we see solely to the fact that the, the, my experience in these cases with the medical profession and the, and the, and the people who are selling the doctors and promoting their products, uh, is a heavy adjustment. Uh, that if I go back to what the earlier suggestion, my colleague to follow up on that, um, the representative drug represent for the reps that go into these doctor's offices, they're there to promote the use of drugs or medicine medicines that they're tell, uh, and to push them to do that. Uh, and, but at what point does this, that, that's what's almost a universal practice. And at what point does that, uh, uh, become actionable as a quick time action, given the, your approach to this, there's a promotion of a legitimate drug. It becomes actionable when there's evidence that shows that the defendant intended to induce referrals by providing benefits, something of value to the provider in exchange for the referrals. That's old. It's old notion that the, uh, that, so that if the, um, uh, frequently they do come with cookies and, uh, uh, flavors for the, for the people who are working under the doctors, uh, they're cozy up to them. Uh, and for, uh, and they also keep medical records of the gender of these medical professions and they match the genders so that, uh, it's, et cetera, et cetera. So all these sales techniques, that's my difficulty with the year. I understand your, your pursuit of this, but how that sorts out in the, in the reality of what's going on out there. Well, your honor, at some point, the, the, a benefit may be de minimis to the point where no reasonable person could plausibly conclude that the, the, that the benefit would actually induce the, uh, referral, but when it's tens of thousands of dollars trips to Las Vegas, fancy dinners, annuity streams, and it's specifically in black and white for the purpose of getting requisitions back up and reengaging the doctor, then it's a very different case. There are no further questions. I'll, I don't know if I've reserved any time, but yes, you've saved time for a bottle. Thank you. Thank you. Mr. Richter. John Richter on behalf of Senseonics, may it please the court. There is nothing inherently suspicious about a medical device company with a brand new product that is just being introduced to the market marketplace, engaging key opinion leaders, experienced physicians to speak about the product, to educate, to raise awareness through marketing, to introduce a new device and ensure that it is used safely and effectively. Companies like Senseonics routinely engage physicians to speak and routinely market to those doctors whom they believe may treat patients for whom the device is intended. And no matter how generous the trip, let's say it's, you know, to the Chili's Club Med we're talking, you know, let's exaggerate it a little, not just Las Vegas. And at no point would it become actionable provided they're just promoting an approved device, no matter how generous the company is to them. Well, that gets at the rub of why the amended complaint here is so deficient is that none of the details that this court sees and recognizes in other cases about speaker arrangements that are found to give rise to the kinds of inferences that convert and otherwise lawful speaking engagement to something plausibly not are alleged. So notwithstanding the rhetoric of the argument, the amended complaint doesn't actually put any facts and meat on the bone as it relates to the speaker arrangements. There are no terms and conditions that are discussed about why Dr. B or Dr. W were engaged. There are the bare outlines in three paragraphs of this complaint that simply, 65, 75 and 84, that simply describe only after the fact, internal discussions between some sales reps who note that the three, that the two doctors spoke. And these are emails and communications in the early part of 2019. When I pressed, he drew comparison to Marlin Medical. Do you know that case? I do. And, and both the Marlin Medical case and the Parikh case, a district court cases that a Relators Council mentioned, both of them have very substantive allegations. Now they're very different facts and circumstances than we have here. They're not about a medical device company. The Marlin Medical is about a compounding company that had a, an alleged scheme to pay doctors to come and speak at an event to patients directly and then actually sit down with the patients and, and engage with them and, and prescribe them the compounded drug that Marlin Medical had and was, and was seeking to promote. They likewise had allegations in the Marlin Medical case about payment arrangements that raised questions about why, how and what this was all about, given that they were making payments to and, and offers to invest in the doctor's companies as opposed to actually paying them for the fair market value of legitimate educational services and speaking engagements. The opposing council did say the district court was troubled particularly by what they're calling the annuity lock-in scheme. Do you want to speak to that? I think that's more patient focused, correct? Completely patient focused. Um, there is no connection. First of all, there's no connection in this amended complaint between these three doctors and any of the other allegations that relate to the market. They ask us to speculate that somehow these doctors may, may have, have been part of that, but, but it's nowhere connected in the amended complaint. So when we look at these, the point, the point that you made Judge Higginson as to the, the simple reality that it's diabetes, it's a chronic condition. You're going to have to go back to the doctor. The context in which that has happened when you look at the allegations in the complaint is their sales reps who are sitting there in 2019 when the device is not covered by CMS and they are asking, gosh, how can we get a doctor to possibly prescribe this since patients are going to have to come out of pocket themselves to pay for the device themselves as opposed to Medicare patients who would be covered for other continuous glucose monitoring devices, which the generalized codes acknowledge are already in existence. And so those patient marketing programs, first of all, all we have are emails that suggest they're talking about it. There are no particularized details that even say it happened. They don't identify a single doctor who they ever went and talked to about these, these things. They never identify a single patient who ever participated in this. So the kinds of, of allegations are in fact consistent with a pre approval, a time when most insurers are not covering the device, including Medicare and they're talking about how can we, you know, engage with doctors, convince doctors to potentially find a way to get over the hump that the reality is they've got a big financial burden that a patient will have to bear until, until such time as coverage is extended to the device, which does not happen. It's uncontroversial. Is there any evidence of alleged, or I should have made the evidence of an allegation of that? In fact, the result of this practices that the accused practice here is that their patients that don't need the product are, are using our buying it and getting reimbursement. There is, there are, there is no, no allegations, no, no scintilla of an even hint of a suggestion that these were medically unnecessary products or that these key opinion leaders who we can presume were endocrine experienced endocrinologists who treat diabetes patients regularly were even use the ever sense device. There's not, they don't actually have a name of a patient or, or a circumstance in, in which, with, with one sole exception, which is they suggest that a that there was occasion when a, an ever sense device failed and the company then presumably we can assume under a warranty claim, although it's not stated there, had had to pay to have the device replaced, presumably because it wasn't covered by any insurance whatsoever, including obviously not a federal insurance. And I think the, the, the most fundamental thing, the one takeaway is the, the, the complaint and I think the court is already cap is catching this. It fails to allege a scheme to defraud, but it throws a lot of information out there and around. And most of that information either is conclusory. So he uses the term sham, but there is no actual the particularized details around this that actually give rise to that, to, to a conclusion of sham. That is a conclusory characterization. What is sort of the dagger and is the easiest thing to conceptualize in this case as to why this court should affirm it is simply the CPT codes. It's important to, to recognize that the CPT codes here are as, as, as, as, as judge, you noted are general, but most importantly about the CPT codes, they are, uh, there is not one allegation that those service codes for continuous glucose monitoring devices were ever used in connection with ever since. The only place where that is alleged is in the reply brief, not in the amended complaint. They said the amended complaints was there was no other product that could fit that code at the time. That's that, that's, that's not true. And, and, and the, the, the, that's not alleged, right? What is alleged in the complaint is it's a generalized code that applies to any continuous glucose monitoring devices. And what is imported through judicial notice by reference to a CMS manual is that the, uh, is, is a predominant device mentioned by CMS in 2019 that it did cover and did pay for by a competitor named Dexcom, which is a continuous glucose monitoring device. What the rhetoric around the world's only I, it remains hanging out there and obviously not beyond this, but obviously sales rhetoric, uh, uh, we can, we can, uh, take for what it, what it's worth. What is clear is this, the complaint, the amended complaint simply does not allege anywhere that Dr. B, Dr. W, Dr. BB ever used, ever since and served a patient using that code. It's not even on information and belief. And so what we're left with in this case is simply an argument that is based on complete and pure speculation that a temporal proximity as the ground, that a general temporal proximity between these three doctors, where there were no details played around them were paid in 2019 and their, and the, and the use of this service code increased in 2019. But those that, that is pure speculation. And it certainly is not the reliable indicia that gives rise to the strong influence. Even without accepting that's true. The question ultimately is, is, is whether the federal treasury was, was, was corrupted. That's what we can have action is. And that is that ultimately that, that the government paid out money that, uh, there was, that was based on fraud. Um, that's where it comes down to. Uh, right. Right. And of course, judge, you know, what, what you wrote and held in the, in the grubs case, um, in terms of that two prong test, uh, that's required. The point I'm making about the CPT codes is they can't show and they don't even allege that there was any claim related to the ever since device. And given that, that's certainly not the reliable indicia. This court has recognized in grubs that gives rise to a strong inference of federal claims here. Um, on the federal claim side, the relators complaint also mentions and, and relators council mentioned in his argument and may mention in rebuttal, try care and the VA. There are no allegations that tie try care and VA back to dr B or dr W or dr BB. There are no other doctors identified whatsoever in the complaint other than those three. Um, all that's talked about is the marketing to try care and V patients. Generally speaking, we don't know who they marketed to, whether they actually marketed to when it occurred, what they said, what they didn't. And as I noted, obviously identifying doctors who have diabetes patients and might have used for this device is what companies logically do. Otherwise, because it's a medically necessary product and it ought to be um, so again, I think what, as, as I stand here today, and in looking at the briefs, um, I think it's, it's essentially the relators council who was asking this court to change the grub standard. Um, he's essentially asking this court to relax it and to suggest that this thin temporal proximity that he is relying on is enough to show federal claims. And he's asking the court on the, on the fraudulent scheme side to take what are essentially three general in total payments for the period of 2019 without further detail and description about what the speaker's engagements for, for, for he mentions Las Vegas. He doesn't talk about where in Las Vegas, he doesn't talk about the location or circumstances that would give rise to an inappropriate situation. I'm sure there are inappropriate situations in Las Vegas. I think we can, we don't have to take judicial notice of it, but you've got to, you've got to plead it. You've got, you got to allege something more than simply that he spoke to, to, to people in Las Vegas. Likewise, the mention, he mentions dinners, um, and, and at fancy steakhouses. Well, there are no allegations that of, of a dinner with any detail. There is one allegation that mentions a nurse who was taken to quote a steakhouse. The, the complaint does not even say that the nurse's meal was paid for by Stencionics. It doesn't characterize the meal itself. It doesn't characterize what was said or not said at the meal. It's simply so that the, the, these, the characterization of the dinners is wildly beyond what the, the amended complaint actually actually has in it. Um, with regard, you asked the question about intent, uh, Judge Smith, um, I, paragraph 70, uh, Sienner is what I was, I'm sorry, excuse me, Sienner, Sienner. Yes, sir. Um, the paragraph 70 is an admonition saying that the company does not induce, does not seek to do that. So it's not clear to me how that could possibly give rise, uh, to, to an inference of Sienner. Um, well it would be an indication that if the company were to do otherwise, otherwise that it would be unlawful. If you're, if you're telling people what is, what is lawful and what isn't lawful, then, then, then the implication of that is that if they do the wrong thing, uh, it's unlawful and that would be Sienner. Right. And so you've got to have more than just simply a denial, uh, a recognition that we don't do, we, we, we don't want to do what, uh, would, would break the law, uh, in, in order to, uh, make, uh, an amended complaint survive a motion to dismiss. Um, this is the strikes me that this is a product that, uh, that, uh, you, you, you need or you don't need. Uh, it's not persuading people to take products. It's not selling one product that if you start to take an opioid, uh, that is stated another way, the medical, the glucose monitoring code, uh, is needed, but, but by the diabetic and the, so that regardless of how they end up where they, where they buy it and purchase it, uh, ultimately the claim there's no, there's, there's no dollars coming out of the federal treasury. And so whatever, uh, that to me is a strikes me as a, kind of an odd way to characterize it. We, Tim C. Well, uh, in full agreement, uh, your honor, the CPT codes here. Yeah. I mean, the CPT codes here are so general. Um, and, and, and basically therefore the fact that, that, uh, that doctors used that code to potentially interpret data from some glucose monitoring product in years when Eversense was not eligible, um, obviously is, uh, it may be true, but it does not link to the Eversense device and it does not provide the reliable indicia that gives rise to the strong inference that this court, uh, uh, requires. And, and frankly, um, I think it also defies the logic of the situation that existed in 2019. As this court has made very clear, the facts and circumstances matter. And this is the early stages of the development of a product and, and, and, and the commercialization of a product. And at that point in time, the product is coming into a marketplace that already has competition. The service codes are already being used on other continuous glucose monitoring devices. The key opinion leaders are already treating diabetic patients with other continuous glucose monitoring devices. And those devices that are recognized through the judicially noticed materials from CMS are coming online in 2019, in 2018, 2019, the period that we're talking about. So the fact that there would be increases in the use of certain CPT codes associated with serving, servicing patients with continuous glucose monitoring devices is logical. But it's most logical and most plausible that it would relate to a competitor's device, not the Eversense device. And so, uh, that, that's the, the, the circumstances, uh, that were confronted, uh, here. Um, and, and because obviously the complaint is deficient and because this relator is not asking on appeal to be allowed to replete this court should rightly, rightly affirm. All right. Thank you, Mr. Richter. Thank you. Rosenthal for rebuttal. Yes, Your Honor. Briefly, I just want to make sure that we level set here, that we are talking about the, uh, the complaint stage. We are talking about allegations that, and whether they give rise to a plausible inference of liability, the allegations have to be taken as true and they have to be interpreted in a light favorable to the plaintiff. Uh, if a counsel is correct about what is what he said, the factual assertions that were made, then discovery will bear that out quickly and discovery here would be targeted because the allegations are specific. They talk about particular individuals in a particular time period, targeting particular providers, uh, to induce referrals of a particular device from certain types of patients that have government payer, uh, insurance. Um, there were a few statements that I do want to address. One, there was a statement that there's no allegation in the complaint about, uh, the Everson CGM being the world's only long-term CGM system, but right in paragraph six of the complaint, it quotes since the Onyx itself and sites to its own website saying since the Onyx refers to the Everson CGM system as quote, the world's only long-term CGM system. So these allegations are in the complaint. Uh, there's, he says there's no allegation that, um, that these dinners were provided, uh, by since the Onyx. But if we look at paragraph 81 of the complaint, we see Mr. Ramirez emailing his sales team talking about, we need to get high potential clinicians to these dinners at the AAC conference. And we want high value targets that will embrace Everson's. He talks about, uh, finding current subscribers, but other big potential subscribers. These providers are being targeted to participate in these dinners because they could their potential to prescribe same thing with the speakers. There was a suggestion that speakers are being targeted because of their credentials or their experience, but that's baloney. We don't see any of that in the documents and we don't see that in the complaint. What we see is that speakers are targeted based on their potential as clinicians to prescribe Everson's. They're not targeted because of their standing in the community. In fact, as council mentioned, one of the people that was taking the dinner was a nurse named Joe. He's not necessarily an influential member of the community. There's of the medical community. There's no indication that he was targeted because of that. He was targeted because he had the, he was in a position to refer patients for Everson's council made the argument that we don't have a direct line between referrals that were made and remuneration that was paid. But that direct line is exactly where grubs differs from the minority view that came out of the 11th circuit that grubs expressly rejects. That view requires direct allegations of claims that were actually submitted and demands that there be direct allegations that connect the remuneration to particular claims. The grub standard only requires that inferences be drawn. Dots can be put out there and lines can be drawn that are reasonably connected. That is what an inference is. And here it is a very reasonable inference to make that when since the onyx sets out and targets providers based on the potential to prescribe monitors the requisitions of providers engages in further efforts to provide remuneration when those requisition requisitions drop when they do all of those things. And then we see that after they've provided those benefits, the use of codes that would be associated with the defendant's device skyrocket. It is a reasonable inference to draw that those claims are associated with since the onyx device. Counsel made the argument that it's more plausible in his view that this related to other devices. Well, I would disagree with that. I would say that it's most plausible that the doctors who are being paid tens of thousands of dollars and fed it around the country by since the onyx are in fact prescribing since the onyx. But ultimately the question is irrelevant because the court is not at the complaint stage in the position to weigh what is more or less probable. The question is simply whether the allegations are plausible. And if the allegations are plausible as the district were conceded they are, then the complaint goes forward. We get to discovery. And if it turns out that all of these requisitions were in fact for another device, discovery will reveal that in short order. The pond, as Grubb says, will either be stocked or barren and we'll find that out quickly. And a motion for summary judgment can follow. In fact, if it turns out that they weren't requisitioning the device, I imagine we wouldn't even pursue the case further. But I suspect strongly and I think it's reasonable to think and certainly plausible that we will find that these requisitions and this increase in claims did relate to the ever since CGM. That's why these doctors were being targeted. That's why their requisitions were being monitored. That's why they continue to be engaged by since the onyx. Are there any further questions? All right. Thank you, Mr. Rosenthal. Your case is under submission. The court will take a brief recess.